Trade Action Coalition v. United States Trade Action Coalition v. United States Trade Action Coalition v. United States Trade Action Coalition v. United States Trade Action Coalition v. United States Trade Action Coalition v. United States Trade Action Coalition v. United States Trade Action Coalition v. United States Trade Action Coalition I think we're ready, Mr. Shane, whenever you are. Morning, Your Honors. Please accord. I'm Jack Shane of Wiley-Rhein. Here today on behalf of the plaintiff, the Rebar Trade Action Coalition. This appeal concerns the first administrative review of the 2014 countervailing duty order on Turkish Rebar, where Commerce found that the mandatory respondent, ICTAS, did not receive countervailable benefits by selling electricity to the Turkish government at more than adequate remuneration, or MTAR. ICTAS sold electricity in two ways to the Turkish government, either in the form of direct bilateral contract sales or through sales to the grid. With regard to the direct contract sales, the agency found that the contract prices to the Turkish government were not at MTAR because they represented discounts from the prices established in Turkey's national price schedules. However, Commerce failed to consider that the prices in the national price schedules are set by a Turkish government agency, a fact that reasonably calls into question whether those price schedules reflect a market basis. Isn't it true? I know there are two separate issues here about the grid and the government's involvement. But isn't it correct that consumers were free to choose to transact with any provider at any price in the system? And therefore, I'm having a hard time getting around the fact that this is market based. If the price was higher than what the electricity was worth, you'd think in this kind of economy, some other provider would come in and undercut that price. That's the way market based economies work. And so reading as much as I could or as much as I could understand about this, it seemed to me that's the way the system worked. So you have a system that's heavily dominated by the Turkish government. You have a national price schedule that's set by a Turkish government agency. The Commerce Department in its analysis, because that's what we need to look to, is how did the Commerce Department analyze this issue? It said, without any support, the Turkish national price schedule, there's no reason to think it's not market based. Therefore, since these prices between ICDAS and other government entities were less than or the same as those price schedules, could not be at MTAR. So it didn't conduct any of the required analysis under its own regulations, 351511, as to figure out whenever you have purchases by the government under commerce precedent and regulations, it's required to go through a benchmark analysis. It never did that. It never looked at whether there was a market based price you could use to say, hey, okay, we're going to compare the prices that ICDAS is selling for versus other comparable prices in the market. Or if that wasn't available because you have a market dominated by the Turkish government in terms of electricity, is there a world market price? We had put a world market price on the record. Commerce never looked at it, never talked about it, never mentioned it. If that wasn't available, then it would be required to go to what's called a tier three analysis, never any discussion of that. So in terms of the way commerce handled this issue, it completely ignored, again, its own precedent, its own regulations. Well, its regulations specifically are directed to LTAR, not MTAR, right? And there appears to be at least some authority. It looked to me like it was somewhat mixed, but some authority for the proposition that they would not necessarily apply that regulation to MTAR situations as opposed to LTAR. So, Your Honor, I would respectfully disagree with that. If you take a look at the preamble to the regulations, commerce says we're not going to do a separate provision for MTAR. Because we don't have enough experience with MTAR. Well, it says we're generally going to apply the LTAR analysis to it, and that's what they've done in other cases. I didn't read it to be quite that specific. I read it to suggest that we may apply the LTAR analysis, but right now we don't have enough experience with the MTAR situation to feel that we want to lock ourselves into the regulation. Is that not a fair reading of the preamble? I think that's a little too restrictive, Your Honor. My view is saying we're going to generally apply the LTAR analysis, but beyond that, it actually has done that in other cases, as we've cited. The uranium from France case, for example. That's what it's done in the limited cases that are out there. It has applied that provision to the MTAR analysis. Now, you make a point in your brief that because the NPS rate is regulated, is fixed, it's not market responsive, that the discounted price below the NPS must not be marketed. I didn't see that as necessarily following. I mean, it's not discounted by X amount. I gather that it's a product of negotiated transactions. Our concern was the way that commerce applied its analysis in this case. It said, again, without any evidence or analysis, that the national price schedule was market-based. Therefore, since these other prices were less, that was sufficient. So, for example, let's assume, I think we put this in our brief, you have a price that's $2 a kilowatt for the national price schedule, and the actual market price should have been $1. So the fact that, let's say, ICDAS is selling to the government at $1.50 a kilowatt, that is still at MTAR. Sure, but why wouldn't you expect, if these discounted prices are the product of negotiated transactions, that the price that the two parties would reach would be $1? And therefore, the fact that the starting point was regulated is insignificant. Well, so first, again, looking at commerce's analysis, they didn't go through that analysis. Commerce simply said, the national price schedule is a market-based price, these prices are less, therefore, and this is like two or three sentences, their analysis is very brief, therefore, the prices that ICDAS is charging cannot be at MTAR. That's the sum total of their analysis. So what I'm saying is, you have to go through this under the statute. The statute requires commerce to look at prevailing market conditions. It has, in my view, the preamble and, in addition to that, its own precedent in terms of the cases where it is applied at MTAR. It has to go through this benchmarking and tier analysis to figure out whether those sales are at MTAR. And it simply did not do that. Secondly, in terms of sales to the grid, commerce found that sales to the grid are made through wholesale market run by the Turkish government agency, TEAS. Acknowledge that it has a role as a market facilitator, settlement functions, but in addition that it obtains electricity from generators. Wait a minute. Commerce concluded the government doesn't purchase electricity on the grid. Isn't that probative of what we're discussing here, what we're analyzing here? Commerce said that TEAS obtains electricity on the grid, but does not pay for it or purchase it. Our contention is, first, they completely ignore the applicable law under law 6446, Article 8.1, which specifically authorizes TEAS to purchase electricity on the grid. Secondly, under the regulations, the balancing settlement regulations, under Article 8.3, it actually mandates that TEAS purchase energy via the balancing power market. Commerce never mentions those to either the statute or the regulation in terms of its analysis as to whether or not TEAS purchased electricity. It simply points to an Article 9 in the regulations, which says that TEAS can't make or lose money in its market facilitation operations. In other words, where it is issuing invoices, where it's helping payment settlement issues and the like. We don't disagree with that. The problem is that Article 9 doesn't address the other obligation of TEAS, which is to make sure there's no shortfall on the grid. To do that, it purchases electricity so that demands on the grid are met. That's the whole point of this provision under Article 8.1 in the law and under Article 8.3 in the balancing and settlement regulations. Commerce never says anything about those regulations and its analysis. In addition, ICDAS itself has now admitted in its brief that its own sales listing includes TEAS as a customer. Not only do you have this legal requirement that TEAS purchase electricity. Again, commerce never dealt with the applicable law or regulations. In fact, ICDAS has now admitted that TEAS is a customer. It's listed on their sales listing. You're into your rebuttals, so why don't we hear from you. Okay, thank you. We serve the remainder of your time. Thank you. Good morning, Your Honors, and may it please the Court. Commerce reasonably determined that the government of Turkey provides no countervailable benefit to producers of electricity by way of the two channels that are under review here by which electricity is sold in Turkey. The first is the wholesale on the grid market, and the second is through bilateral contracts in the retail market through the free consumer. I wanted to address the last argument that your friend gave with regard to the TEAS and the evidence record that demonstrated their participation and purchase of electricity. The TEAS is the system operator of the electricity market, and that's the on the grid sales. Commerce here found and is supported by responses from the government of Turkey as well as ICDAS, the TEAS serves as kind of this clearinghouse for electricity purchases on the wholesale market. The wholesale market are transactions between power producers or generators and distributors, and TEAS is a government entity that facilitates that exchange. Prices are not set by TEAS. Our tax does not disagree with that. Rather, TEAS creates a market by which bids and offers are made a day ahead of the transactions being made, and then again in a balancing market that happens just hours before the actual transactions are made to account for any shortfalls that may have resulted from the day ahead market. Our tax mentions that TEAS appears as a customer on one of ICDAS' sales lists, and the reason for that is simple. It's because these transactions that are made on the grid are double blind, so buyers and sellers of electricity never know who the other participant is. TEAS is middleman, so to speak, and so the seller of electricity is invoicing TEAS for the amount that is consumed. So you're saying TEAS never purchases any electricity. At most, it's acting transaction by transaction as an agent. Correct. It's a facilitator. It's an escrow in effect? It's a facilitator, I would say. All right. But at some point, the electricity is at some point nominally, at least in TEAS' ownership? TEAS never takes title to the electricity, and there's nothing on the record that supports that. And banks, private banks, actually facilitate the financial transaction piece of that. At most, TEAS and the market's financial settlement piece of that is a clearinghouse of sorts. And the argument is that by way of this balancing market that is secondary to the primary day-ahead trading market, TEAS does have a role in ensuring that there's enough electricity in the market so there is not a shortfall. But again, there is no record evidence, and in fact there's direct record evidence to the contrary, that TEAS ever purchases electricity. This is the evidence from the government of Turkey saying that it doesn't purchase? That is correct. In addition to that, although this was not discussed at length, ICDOS submitted its own response to some questionnaires in describing the mechanisms of how TEAS can go about balancing the market. In particular, when there is a shortfall, TEAS has the authority to send signals or instructions to a generator to say generate more power within a certain window. And that's one of the balancing tools that uses in the primary and the secondary reserve market. But again, that is not the same as purchasing, and on this record we don't have any evidence that a purchase was made.  What we do have in the primary is inferences from these regulations that give TEAS the authority to engage in balancing. What about the sales on bilateral contracts? And Mr. Shane was emphasizing that the NPS is in fact a regulated price contrary to Commerce's suggestion, and that the discount is therefore, the discounted price is therefore not a market price or can't be inferred to be a market price. Well, the NPS doesn't apply to these free consumers, so there is in the retail market between... Fill me in on that, because my understanding was that the negotiated contracts were negotiated at a discount from the NPS, right? The prices end up being a discount from the NPS. But you say that they don't depend on the NPS. Correct, because the whole purpose of the free contracts or the free consumers is that they're not regulated at all by this, it's called EMRA, the Energy Market Regulator. Okay, well what about the question of whether the NPS is regulated or whether it is a market rate? Well, they are set prices. There is a price schedule that NPS uses for all the retail electricity in Turkey. Is it market driven or is it not? Or is there any evidence? There hasn't been any evidence put on the record, and our talk doesn't point to any, and as this court knows it's the petitioner's burden to make the record here, that there's anything other than a market rate that's being used. So even if we were to engage in that less than adequate remuneration regulatory analysis there, there has to be some indication that this price does not reflect a market rate. And that market rate does not have to be in accordance with free market principles like we may be accustomed to here in the United States. But they haven't pointed to anything. Instead, ARTEC assumes because there is a price schedule, I think what's important, what is left out of the price schedule, the discussion of it that ARTEC makes, is that it's not one price that applies to all consumers. Different categories of consumers have different prices. So the point you just raised is one that was interesting to me in your brief. You say that, well, it could either be a market price, or it could be consistent with the way prices are set in the particular country, and in either event, it's not a countervailing subsidy. But suppose you have a country in which the government has decided that they will subsidize energy by setting all prices much higher than the market price would be. Are you saying that in that setting, there would be no countervailing subsidy, no subsidy of a large producer that is getting the benefit of that increased price that is being paid? I think it depends on the inputs that go into determining that price. If that is, in fact, a price that's- Let's just assume. I'll make it really simplistic. Let's assume that just the government decides everybody should have electricity that's only going to cost half what it would if we went by a market system and then pays these large amounts of money from the government to all producers of electricity in order to offset the losses that they would otherwise sustain. Are you saying that's okay and that that would indicate there's no subsidy? I think that's what the whole purpose of the Tier 3 analysis is, is to see if the prices that are set, do they cover losses? Do they cover the costs that are being incurred to produce whatever this good or service is? Are they applied uniformly to all participants in that market? Okay. Now, that leads to the question of whether the regulation for LTAR should apply, at least in spirit, if not by letter in this case. And Mr. Shane said that the preamble indicates that it should be applied. Your position on that? Well, it didn't need to be applied here because we're not talking about LTAR. We're talking about more than adequate. Right. And he's saying that MTAR was, by the terms of the preamble, intended to be included at least in the spirit of the regulation, if not by letter. We don't disagree that commerce would have been, you know, by the preamble of that regulation would have been free to adopt such an approach, but it didn't need to do so here. And the reason is because it looked at the process by which these contracts were negotiated and those prices were reached, and it said there couldn't have been more than adequate remuneration because there was no non-market price that was influencing the prices here that control these contracts. And so it was never triggered, and it was not required to engage in that analysis. If there are no further questions, we respectfully request that this court affirm the ruling below, sustaining commerce's final determination, and I will see the rest of my time to address. Good morning, Your Honors. If it may please the court. Starting with the picking up on the last topic, the topic of the sales to the free consumers, there has been discussion on whether the MTAR regulations, the LTAR regulations should apply to the MTAR regulations. And unlike my colleague here, we have a slightly different reading of the preamble, and the preamble is not as forceful in stating that the LTAR regulations should apply to this situation. And if that were the case, there probably would be a regulation in commerce in title, 19 CFR, but there isn't. However, the preamble does provide some commentary on what would be considered as more than adequate remuneration. And I'm citing for the preamble, and it says that when we talk about a firm paying less for inputs than it otherwise would pay or receiving more revenue than it otherwise would earn, we are referring to the lower price that it pays to acquire the thing provided by the government or the increased revenue it receives as a result of the government action. Now, if we apply this principle to the transactions here, then they don't describe the sales of electricity by ICDAS to the free consumers because ICDAS, in fact, received more revenue selling to parties that are not affiliated with the government because the prices were negotiated. And what the record actually shows is that some of the prices that ICDAS sold to private parties were higher, so the discount was lower than what it offered to the government, to the three government-related entities. So that doesn't seem consistent. That negates the idea that there is a benefit that was provided to ICDAS by selling to these three government-affiliated parties. So what is certain is that the prices negotiated with the free consumers were lower than the national price schedule. And because they were lower, ICDAS could have actually obtained higher revenue by just selling its electricity to regular consumers. And the vast majority of ICDAS' sales during the POR were to private party free consumers, were not to the government. And in fact, the sales to the public free consumers was only 0.4% of its total sales of electricity to free consumers. On the issue of market-based prices, one of the things, one of the issues where we disagree strongly with Petitioner is this characterization of the Turkish electricity market as being dominated by the government of Turkey. In fact, what the questionnaire responses provide is that the government of Turkey entities accounted for less than 25% of the total electric power generation during the period of review. And that is at appendix page 212. In addition, in the market, there are participants that are both private and public. So we're not in a situation where you have a market that is dominated by the government, where there is distortion because of that. There are market forces not only because there is a negotiation of the prices from the tariff schedule, but also because the participants, the availability of this good comes from both public and private sources. So in some sense, there is no need to go through the tier three benchmark that my colleagues have discussed, because there are actually private transactions in the country at issue that could be used for an analysis of whether there is a benefit. And the government found, based on the evidence before it, well, these transactions offer more revenue to Igdaş. There can be no benefit per se. Okay. Your time has expired. So first, in terms of sales to the grid, this is not an inference we are making. If you look at, again, the legal structure in Turkey, both under the law and the regulations, TEAS is authorized and, in fact, is mandated to purchase electricity to make up for any potential shortfalls. In addition, Igdaş itself has admitted that TEAS is listed as a customer. There is no explanation that somehow this is because they are a go-between. They are listed as a customer of Igdaş. I think the combination of the law, the regulations, and that fact should be definitive in determining whether or not TEAS makes purchases on the grid. With regard to... What do you do about the government of Turkey declaration that says that's not so? Well, so, the Turkish government says that TEAS obtains electricity. They admit that. But they claim it doesn't purchase it. I'm not sure how you obtain it without purchasing it when, in fact, the Turkish regulations and law say that TEAS shall purchase electricity to make up for these shortfalls. In addition, and there's a World Bank study, 2015, that says that generators actually make additional revenue from agreements with TEAS on the wholesale market, the ancillary market. I don't know how they make revenue from TEAS if TEAS isn't buying electricity from them. It doesn't wash with the evidence. I think that's the problem with the Turkish government's position that TEAS obtains it but doesn't pay for it. It's just inconsistent with everything else on the record, including Igdaş's own sales listings. And then in terms of the free consumer market in terms of the price schedules that are set by EMRA, we did show that there's evidence on the record that those are not market-based prices. First, they're set by the government. Second, the statute itself that talks about setting those prices doesn't say anything about their market base. They'll be set based on price, supply and demand, anything along those lines. In addition, it says that the reason they're instituting it, at least one reason, is to eliminate price differences among regions in the country. That's not a market-based position in terms of how those prices are being set. In addition, there's evidence on the record that the national price schedules are set to transfer funds from distributors that are making money to those that are losing money. Again, that's not a particularly market-based rationale. Then, in terms of ICDAS's arguments about the relative prices of some of the sales it makes in terms of some of the free consumer prices, Commerce never touched on that. You've got to look and see what Commerce's analysis was. Commerce simply said, again, the national price schedule, there's no reason to think it's not market-based despite all the evidence I just indicated that there is a lot of evidence that it is not market-based, and then simply said, the other prices are less, therefore, that's sufficient for our analysis without doing the required 531, 511 benchmark analysis, talking about the tiers. I mean, if you take a look at the Maverick II case, you can see how the analysis is supposed to go, which Commerce never conducted in this case. Thank you. Thank you, Your Honor. We thank both sides, and the case is submitted. The final case for our